FILED
United States Court of Appeals
Tenth Circuit

August 16, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARK A. BROOKS,

Defendant-Appellant.

and

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARCUS L. QUINN, a/k/a Brick,

Defendant-Appellant.

Nos. 11-3346 and 11-3351

No. 12-3035

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. Nos. 2:10-CR-20129-KHV-3 and 2:10-CR-20129-KHV-6
and 2:10-CR-20035-KHV-1&2)**

---

Howard Pincus, Assistant Federal Public Defender (Raymond P. Moore, former Federal Public Defender, with him on the briefs) Office of the Federal Public Defender, Denver, Colorado, for Appellant Brooks.

Jessica R. Kunen, Attorney at Law, Lawrence, Kansas, on the brief for Appellant Quinn.

David P. Zabel, Assistant United States Attorney (Barry R. Grissom, United States Attorney, and, for Appellant Brooks, Leon Patton, Assistant United States Attorney, with him on the briefs) Office of the United States Attorney, Kansas City, Kansas, for Appellee.

---

Before **TYMKOVICH**, **EBEL**, and **MATHESON**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Mark Brooks and Marcus Quinn were arrested after an investigation into a large Kansas City–area drug distribution operation. They were charged with and convicted of various drug conspiracy charges and sentenced to thirty-five years' and thirty years' imprisonment, respectively. We have consolidated their separate appeals because of the overlapping factual and legal claims.

They contend the district court committed many trial and sentencing errors, including (1) allowing improper overview testimony from the government's lead investigator in a way that usurped the role of the jury; (2) allowing the investigator to vouch for the truthfulness of cooperating witnesses; (3) improperly admitting evidence of prior crimes; (4) denying a motion for acquittal on the conspiracy charge despite insufficient evidence; and (5) imposing sentences that were either procedurally or substantively unreasonable.

We find no reversible error. While the use of testimony to preview the evidence to be admitted later at trial can be abused, the testimony offered here was not plainly erroneous or prejudicial. Nor did the district court err in allowing

the government's investigator to discuss the process that led to the testimony of cooperating witnesses. Evidence of prior crimes was properly admitted and there was sufficient evidence to support the conspiracy conviction. We also conclude that both sentences were procedurally and substantively reasonable.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM the defendants' convictions.

# I. Background

## A. Overview

The charges against Brooks and Quinn arose from an FBI investigation into a large drug-dealing operation in Kansas City, Kansas in 2010. The investigation focused on a residential neighborhood where law enforcement knew a number of houses were centers of drug distribution. The investigation started with a series of controlled purchases made by confidential informants. Most of the purchases were made at three nearby houses on the same street in Kansas City, with addresses 2636, 2635, and 2632. House number, 2632, the FBI determined, was a central distribution point known by drug buyers as "the Spot."

The investigation turned to the houses' occupants—in particular, the Quinn brothers. The FBI believed that Antonio Quinn controlled the Spot, where most of the drug-dealing occurred; that Steven Quinn controlled the house next door at 2636; and that defendant-appellant Marcus Quinn controlled and lived across the

street at 2635.[1]  Using its confidential informants, the FBI conducted controlled purchases of drugs, mostly crack cocaine, from all the brothers at their respective houses.  Informants also made purchases from Marcus Quinn in which he had to go to Antonio's house across the street to obtain the drugs.  In total, the government oversaw twenty-six controlled purchases.

As a result of the purchases the FBI determined that many other individuals sold drugs out of the Spot, including Willie Ford, Lavaughn Brown, Calvin Collins, and Andrew Price.  As the investigation continued, the FBI came to believe that Antonio was the leader of the drug operation and that no one could sell out of the Spot except with Antonio's permission.  As a result, the FBI obtained a Title III wiretap on Antonio's cell phone.  The wiretap lasted from April to October 2010.

On October 13, 2010, the government conducted a raid on the houses and suspects, involving police officers from multiple jurisdictions.  As police officers and FBI agents prepared to execute the warrants, five individuals ran out the back of the Spot, including Price, Brooks and Collins.  They were promptly arrested.  Firearms and large quantities of drugs and cash were seized as part of the arrests.

Brooks and Quinn were both indicted for conspiring to distribute crack cocaine, for conspiring to maintain a drug house within one-thousand feet of a

---

[1]  Any use of "Quinn" standing alone, from here on, refers to Marcus Quinn.  His brothers are referred to by their first names, "Antonio" and "Steven."

school (an elementary school was nearby), and for possessing drugs with intent to distribute. A total of nine people were indicted for the conspiracy to distribute crack, including Antonio and Brown. Other codefendants on the conspiracy charge were Daniel Garcia and Adrian Melendez, who were alleged to have supplied the conspirators with powder cocaine that was then "cooked" into crack. Brown, Garcia, and Melendez all pleaded guilty and agreed to testify on behalf of the government in any trial against their codefendants. Antonio pleaded guilty and received a sentence of twenty-five years, but did not agree to testify. Brooks, Quinn, and Ford did not plead guilty, and were tried together.

### B.    *Agent Swanson's Testimony*

At their trial, the government relied heavily on the testimony of FBI agent Timothy Swanson. Swanson was the agent in charge of investigating the drug operation, though he did not become involved until July 2008. He was the first witness at trial. He began by testifying as to the objectives and course of the investigation. He testified that the FBI focused on a particular neighborhood in Kansas City, Kansas, where there were reports of frequent short-term vehicle and foot traffic—a pattern of activity consistent with drug dealing. Agent Swanson then spoke of the various investigative techniques employed by the FBI, including controlled purchases, physical surveillance, video surveillance, phone records, and wiretaps.

The first time Agent Swanson mentioned any of the charged coconspirators was during the discussion of the wiretap. Swanson stated that the cellular phone the FBI wiretapped belonged to Antonio Quinn. Then, Swanson offered opinion testimony to the effect that the individuals in the drug conspiracy "were being supplied with their cocaine from Antonio Quinn" and that "they had a common residence to sell the drugs from" (*i.e.*, the Spot). Brooks R., Vol. 2 at 267. Swanson also agreed that no one could sell from the Spot unless they had Antonio's permission. He further stated that Steven and Marcus Quinn, along with Brooks, Ford, James, Collins, Price, and Brown, all had access to the house.

Agent Swanson's testimony then turned to a second wiretap, this one placed on Adrian Melendez's phone. Explaining the need for the Melendez wiretap, Swanson identified Melendez as a supplier of powder cocaine to Antonio. Swanson also stated that there were few pertinent calls between Antonio and his brother, Marcus Quinn, a fact that Swanson attributed to the proximity of Antonio's house to Marcus's—they could just cross the street to speak.

A little later Agent Swanson clarified which individuals "controlled" the various houses in the neighborhood. Swanson identified house number 2635 as Marcus Quinn's residence and house number 2643 as a house under Marcus's control. Swanson also identified house number 2623 as Brooks's residence,

which, he stated, was used as a meeting place for Melendez's and Garcia's delivery of drugs to Antonio and Brooks.

On cross-examination, Marcus Quinn's counsel went beyond the subjects broached by the government. He questioned Agent Swanson about whether the FBI's investigation uncovered any financial records referring to Marcus Quinn, records that might indicate he was part of the drug conspiracy. Quinn's counsel also asked Swanson whether there was evidence that Antonio supplied Marcus with drugs, or whether Marcus had any connections (physical or otherwise) to the Spot. Counsel tried to highlight—and this was the main theme of the defense—the difference between an individual dealing drugs alone, albeit in close proximity to others, and one dealing drugs as part of a group enterprise.

On his cross-examination of Agent Swanson, Brooks's counsel asked whether Swanson had actually seen Garcia and Melendez meet Antonio and Brooks at 2623 to exchange money and drugs. Swanson admitted that he had not. In a similar vein to Quinn's counsel, Ford's counsel concentrated his cross-examination questions on whether Ford could have been supplied with drugs by individuals other than Antonio, or was otherwise an independent operator rather than a coconspirator.

On redirect, the government dove deeper into the evidence that it would be presenting. For example, the government asked about specific phone calls that

purportedly linked the defendants to Antonio and whether there was evidence of interdependence among participants in the drug operation.

Agent Swanson testified five more times throughout the trial, principally to give details of the controlled purchases but also to lay foundation for the phone calls recorded as part of the wiretap. He also testified about the government's proffer process following Brown's testimony.

### C.  Lavaughn Brown's Testimony

Brown was one of the government's key witnesses. He implicated Brooks and Quinn in the conspiracy. He further testified that Antonio supplied all of them with the crack cocaine they dealt and that they shared expenses for the utilities at the Spot. Brown identified various voices in audio recordings the FBI had made—either via wiretaps or hidden microphones during the controlled buys—and explained code words and drug lingo used by coconspirators.

On cross-examination, the defendants' respective counsel highlighted details and facts in Brown's testimony that were not present in his initial proffer statements to the government. Brown admitted that his testimony was motivated, in part, by hopes that post-trial the government would ask for a reduction in his sentence.

### D.    Conclusion of Trial & Sentencing

Overall, the government presented twenty-four witnesses over the course of a twelve-day trial. At the trial's conclusion, the jury returned guilty verdicts for

Quinn and Brooks on all charged counts (though, at the end of evidence, the prosecution dismissed a count against Brooks charging him with using a telephone in furtherance of the drug conspiracy).

Each defendant's presentence report (PSR) calculated an offense level of forty-two, which corresponded to a sentencing range of thirty years to life. The calculation was largely driven by the quantity of crack cocaine dealt by coconspirators and attributed to them (over 4.5 kg). Brooks received a thirty-five-year sentence, while Quinn received a thirty-year sentence.

## II. Analysis

Brooks and Quinn appeal their convictions and sentences on multiple grounds. They both argue that the district court committed plain reversible error by failing to exclude opinion and overview testimony from Agent Swanson. In addition, Quinn makes a sufficiency-of-the-evidence challenge to his drug conspiracy conviction as well as a challenge to the district court's admission of evidence relating to his prior drug conviction. Finally, Brooks and Quinn challenge their respective sentences.

We consider each ground in turn.

### A.  *Opinion & Overview Testimony (Brooks & Quinn)*

Brooks and Quinn both object to testimony offered by Agent Swanson on how the government's investigation into the drug conspiracy unfolded and the roles played by individual defendants. The government contends that our

precedent permitted Agent Swanson's testimony and that, to the extent some of the testimony crossed the line, it was a result of the defendants' opening the door during cross-examination. While we share some of the defendants' concerns with overview and opinion testimony, there is no basis to overturn their convictions on this ground.

### 1. Legal Framework

The district court's decision to admit expert or lay testimony is reviewed for abuse of discretion. *United States v. McSwain*, 197 F.3d 472, 482 (10th Cir. 1999). Yet if the defendant did not make a contemporaneous objection to the admission of testimony, as was mostly the case here, then the district court's decision is reviewed for plain error. *See United States v. Frost*, 684 F.3d 963, 971 (10th Cir. 2012). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *United States v. Schene*, 543 F.3d 627, 640 (10th Cir. 2008)). For an error to be plain it must be "clear or obvious under current, well-settled law." *United States v. Thornburgh*, 645 F.3d 1197, 1208 (10th Cir. 2011) (internal quotation marks omitted). And "for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." *Id.* (quoting *United States v. Ruiz-Gea*, 340 F.3d 1181, 1187 (10th Cir. 2003)).

Opinion and overview testimony are related but slightly different types of evidence. Under Federal Rule of Evidence 701, lay opinion testimony must be "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Under Rule 702, expert opinion testimony is allowed if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

Overview testimony is a broader category of evidence, usually offered at the beginning of trial by a government agent as a way to preview the government's case, and can include lay and expert opinion. It occurs when a "witness is put on the stand to testify before there has been any evidence admitted for the witness to summarize." *United States v. Griffin*, 324 F.3d 330, 349 (5th Cir. 2003). The testimony provides "an overview of the government's case, setting forth for the jury the script of the testimony and evidence the jury could expect the government to present in its case-in-chief." *United States v. Moore*, 651 F.3d 30, 54–55 (D.C. Cir. 2011).

Courts generally allow overview testimony to the extent it concerns how an investigation began, the law enforcement agencies involved, or the investigative techniques used. *See id.* at 61; *United States v. Flores-de-Jesus*, 569 F.3d 8, 19 (1st Cir. 2009) (noting that overview testimony should be limited to "constructing

-11-

the sequence of events in the investigation"); *Griffin*, 324 F.3d at 349 (approving of testimony to "describe a complicated government program").

But overview testimony is susceptible to abuse. It can stray into matters that are reserved for the jury, such as opinions about a defendant's guilt or a witness's credibility. An overview witness, for example, might express opinions about the defendant's truthfulness at certain times or his likelihood of being involved in a scheme or crime, thus usurping the jury's role in making fact findings based on the credibility and demeanor of witnesses with personal knowledge. Other potential problems include the government's ability (1) to spin the evidence in its favor before it is admitted (assuming it is ever admitted), (2) to give its official imprimatur to certain evidence, and (3) to allow its witnesses (usually law enforcement) to testify on matters about which they have no personal knowledge or that are based on hearsay. *See Moore*, 651 F.3d at 56. As one court put it,

> [S]uch testimony raises the very real specter that the jury verdict could be influenced by statements of fact or credibility assessments in the overview but not in evidence. There is also the possibility that later testimony might be different than what the overview witness assumed; objections could be sustained or the witness could change his or her story. Overview testimony by government agents is especially problematic because juries may place greater weight on evidence perceived to have the imprimatur of the government.

*United States v. Casas*, 356 F.3d 104, 119–20 (1st Cir. 2004) (citations omitted).

We have permitted overview evidence in limited circumstances. "[T]he government may introduce expert testimony as to the roles played by participants [in a criminal enterprise]." *McSwain*, 197 F.3d at 482. And in *United States v. Pinelli*, 890 F.2d 1461, 1474–75 (10th Cir. 1989), we allowed expert testimony on the various roles played by participants in a gambling operation.

*McSwain* is illustrative. In that case, over the defendant's objection, the district court admitted opinion testimony by a government agent on the role played by the defendant in a distribution network for a precursor chemical for PCP, known as piperidine. 197 F.3d at 482. In upholding the admission of the testimony, we relied on Rule 702, noting that the key inquiry was whether the testimony "will assist the trier of fact to understand the evidence." *Id.* (quoting Rule 702). We concluded that "[g]iven the complexity of the piperidine distribution network, the average person's unfamiliarity with the workings of that network and the number of people involved with it, it was well within the discretion of the trial judge to permit such testimony on the theory that [the government agent's] specialized knowledge would assist the trier-of-fact in understanding the evidence." *Id.* (internal quotation marks omitted).

Yet the district court's discretion to permit such testimony under Rule 702 is not unlimited. In *United States v. Ray*, 370 F.3d 1039 (10th Cir. 2004), *vacated on other grounds*, 543 U.S. 1109 (2005), we addressed the issue of *summary* testimony in a drug conspiracy case. Although conceptually similar to overview

-13-

testimony—which comes in at the beginning of a case—summary testimony comes toward the end of a case and is used to repackage complex testimony or already-admitted evidence for the jury. In *Ray*, the government put forward an FBI agent as a witness who testified at the close of trial with charts and exhibits summarizing the government's case against the coconspirators. We held that the district court must look at two factors when determining whether to admit summary testimony and accompanying charts: (1) the testimony's or chart's potential to "aid[] the jury in ascertaining the truth," *id.* at 1046; and (2) "the possible prejudice that may result to the defendant in allowing such evidence," *id.* at 1047. Under those principles, the FBI agent's testimony was admissible because the evidence at trial was particularly voluminous; the trial lasted twenty-three days and involved over fifty witnesses. As a result, the agent's testimony would have proved helpful to the jury. At the same time, we held that, under the circumstances of the case, the same testimony was not admissible under Rule 702 because it was not based on "specialized knowledge," as required by the Rule. *Id.* at 1046 (citation omitted). *Ray* thus demonstrates that not all criminal enterprises will be complex enough to allow experts to opine on a defendant's role in a conspiracy.[2]

_____

[2] As a general matter, testimony about a defendant's substantive guilt in a conspiracy should also not be permitted as *lay* opinion under Rule 701. *See United States v. Meises*, 645 F.3d 5 (1st Cir. 2011); *see also Moore*, 651 F.3d at 60 (FBI agent was "improper in offering his non-expert opinions about the

(continued...)

With this background, we turn to the testimony by Agent Swanson.

### *2.* *Discussion*

Brooks and Quinn contend that Agent Swanson's testimony violates these principles. While the government relies on *McSwain* to justify Agent Swanson's testimony, before trial the government never sought to qualify him as an expert on the role played by the defendants in the charged conspiracy. (He was qualified as an expert only on the means utilized by drug dealers, in general, to obtain and distribute drugs.) Thus, the government did not properly qualify Agent Swanson as an expert on the testimony it now defends.

At the same time, the defendants did not object at trial to the admission of improper expert evidence. And a court need not conduct "an inquiry questioning and challenging the scientific proffer absent a timely request by an objecting party." *Macsenti v. Becker*, 237 F.3d 1223, 1231–32 (10th Cir. 2001). As a result, we review the testimony only for plain error.

Even if the testimony should have been more limited, its admission was not plainly erroneous. As an initial matter, we agree with the defendants that it is

²(...continued)
charged conspiracy and appellants, vouching for the reliability of the investigation and of the cooperating co-conspirator witnesses . . . , and discussing evidence that had yet to be introduced"). These are matters for witnesses with direct personal knowledge. With respect to lay opinions, Rule 701's intention is "to exclude testimony where the witness is no better suited than the jury to make the judgment at issue, providing assurance against the admission of opinions which merely tell the jury what result to reach." *Meises*, 645 F.3d at 16 (citations and internal quotation marks omitted).

doubtful expert opinion was necessary in this case to help educate the jury. The charged conspiracy, while certainly not small or inconsequential, would not have been particularly unfamiliar to lay persons—such that specialized knowledge was required to help them understand its various moving parts. *Cf. Ray*, 370 F.3d at 1046 (no specialized knowledge needed to summarize facts of government's drug conspiracy case, and thus testimony was inadmissible under Rule 702). At bottom, this was a drug ring with a leader and a small group of followers. They all dealt drugs out of a few adjacent houses in one neighborhood, and largely obtained their supply from one individual. There was no national or international dimension; no complex financing scheme; no elaborate command and control structures.

But nonetheless, any error the district court may have committed was not plain. Our prior cases have generally allowed expert testimony on the nature and extent of conspiracy. *See McSwain,* 197 F.3d at 482; *Pinelli*, 890 F.2d at 1474. And none of our prior cases have condemned unobjected-to overview testimony to the extent defendants now request. *See United States v. Fletcher*, 497 F. App'x 795, 805 (10th Cir. 2012) (applying *McSwain* to overview testimony in drug conspiracy case).

More importantly, the evidence Brooks and Quinn find the most troubling was elicited after *they* opened the door to the testimony. The first instance occurred after Quinn's counsel, on cross-examination, had asked Agent Swanson

multiple questions about what type of evidence *would not* be presented during the trial—such as the absence of financial records showing transactions between Quinn and his brother Antonio, or the absence in the wiretapped conversations of comments relating to Quinn's involvement. On redirect, the government asked Swanson "to kind of give us a road map or highlight what the nature of the evidence will be." Quinn R., Vol. 3 at 454. Quinn's counsel objected: "This is what opening statements are for at the beginning of the trial. I don't know why we're summarizing the evidence here to as what the evidence is going to be from the witness . . . ." *Id.* The government replied that it had not intended to pursue this line of questioning, but that it had felt compelled to respond after Quinn's counsel had sought to highlight the *absence* of certain evidence. The court agreed that because the "door was opened" on cross, the line of questioning was permissible. *Id.*

We have held that where "defense counsel purposefully and explicitly opens the door on a particular (and otherwise inadmissible) line of questioning, such conduct operates as a limited waiver allowing the government to introduce further evidence on that same topic." *United States v. Lopez-Medina*, 596 F.3d 716, 731 (10th Cir. 2010). And "the decision to admit or exclude rebuttal testimony remains within the trial court's sound discretion." *Tanberg v. Sholtis*, 401 F.3d 1151, 1166 (10th Cir. 2005). Here, it is clear the district court did not abuse its discretion in allowing the government's questioning to rebut testimony

Quinn's counsel had elicited on cross-examination. The questioning was limited and did not go beyond the subjects defense counsel had themselves broached.

The same rule applies to testimony singled out by Brooks (though, unlike Quinn, Brooks never in fact objected to it at trial). After the government's initial direct examination of Agent Swanson, he was cross-examined by each of the codefendants' counsel. Brooks's counsel's cross-examination was limited, focusing on whether drugs or money were ever found at Brooks's residence. Ford's and Quinn's respective counsels conducted more probing cross-examinations, focusing on the operation of the drug conspiracy and the use of confidential informants. In one question, Ford's counsel asked Agent Swanson whether there were phone calls between Ford and either Antonio or Brooks. Brooks now complains that on redirect the government elicited prohibited, damaging testimony from Swanson. For example, the government asked Swanson to identify who "hung out" at the Spot. In response, Agent Swanson mentioned Ford, Brooks, and Brown, among others, and answered yes when asked whether they all had a drug dealing relationship with Antonio. Brooks R., Vol. 2 at 441.

While these comments on the surface appear troublesome under our case law, Brooks's counsel sought to question the link between Brooks and the conspiracy, thereby partially opening the door to testimony about Brooks's involvement in the conspiracy. And the codefendants further opened the door to such testimony by trying to highlight the lack of evidence tying the codefendants

-18-

together.  *See United States v. Sullivan*, 911 F.2d 2, 8 (7th Cir. 1990) (codefendant can open door to issue for defendant if defendant does not object to questioning on that issue).  While the redirect testimony may have gone beyond the scope of the cross-examination questions, we cannot say that, given the absence of any objection, the district court committed plain error in failing to exclude *sua sponte* such testimony.

One cautionary note: That Brooks and Quinn opened the door to such testimony should not be surprising.  The nature of overview testimony creates a powerful lure to expand the scope of the cross.  Even if the government agents limit themselves to the course of an investigation—and do not explicitly seek to preview the evidence—the substance of the case invariably escapes.  For example, Agent Swanson, in testifying about the course of the investigation, touched on issues that were in dispute, such as why the government focused its investigation on the Quinn brothers' houses and why it wiretapped Antonio Quinn's cell phone.  On cross-examination, the defendants' lawyers understandably wanted to attack the government's reasons for its actions, and they did just that.  But in doing so, the defendants opened the door to more in-depth questioning on those same issues on redirect.  As a result of this sort of dynamic, rudimentary overview testimony of a government's investigation can morph into a full-blown inquiry into the strengths and weaknesses of the government's case—all before the actual evidence is ever presented to the jury.

One way to minimize such dangers is for the district court to limit overview testimony to a high-level of generality, focused on the investigative techniques used and the course of the investigation while only mentioning names to the extent necessary to explain the next course of action taken. Otherwise, the government's agent should not be testifying second-hand as to the incriminating information gleaned during the investigation. (Obviously, if the agent has first-hand knowledge—*e.g.*, witnessed a controlled drug purchase himself—then he can testify to it.) And, to the extent names are mentioned during the course of overview testimony, the court should give a limiting instruction that such explanations are not substantive evidence of an individual's guilt or involvement in a conspiracy but only background information to understand why the government did what it did. *Cf. Moore*, 651 F.3d at 61 (finding no prejudice for opinion testimony in part because district court gave jury instruction "to disregard any opinion testimony").

Notwithstanding these concerns, it was not plainly wrong or prejudicial to allow the testimony. Most of the overview testimony that Agent Swanson gave was based on first-hand knowledge or came in through multiple witnesses. He personally supervised most of the controlled drug purchases by confidential informants and oversaw the wiretap. The cooperating witnesses with firsthand knowledge described in great detail the activities of Brooks and Quinn. And the opinion testimony that was elicited on direct—such as who controlled the drug

houses, who led the drug organization, and the explanation for why so few of the wire-tapped calls were between Antonio Quinn and Marcus Quinn—was not so clearly inappropriate that the court plainly erred in failing to exclude without a defense objection. *See United States v. Williams*, 527 F.3d 1235, 1247 (11th Cir. 2008) ("For the admission of evidence to constitute plain error, the evidence must have been so obviously inadmissible and prejudicial that, despite defense counsel's failure to object, the district court, *sua sponte*, should have excluded the evidence." (internal quotation marks omitted)); *cf. United States v. Solomon*, 399 F.3d 1231, 1237–38 (10th Cir. 2005) (district court can, under certain circumstances, commit plain error by not raising Confrontation Clause issue *sua sponte*).

We therefore reject the contention that a new trial is warranted on this basis.

### B.    *Bolstering Witnesses (Brooks and Quinn)*

Brooks and Quinn also argue the government improperly bolstered its cooperating witnesses through the testimony of Agent Swanson. In particular, they claim Agent Swanson's testimony about how the witnesses conferred with the government on the scope and substance of their testimony—the proffer process—constituted reversible error. For example, Agent Swanson acknowledged he began the proffer process "by basically asking [the witnesses] questions that you know the answers to to see whether they're going to be

truthful." Quinn R., Vol. 3 at 2528; *see also United States v. Bowie*, 892 F.2d 1494, 1498 (10th Cir. 1990) (due process violation for prosecutor to express "a personal belief in the witness' credibility").

Yet Agent Swanson's testimony came in only because Brooks and Quinn opened the door to the proffer process. During the cross-examination of various cooperating witnesses, Brooks's and Quinn's respective counsel had tried to highlight details in the witnesses' testimonies that had been absent in their original proffers—with the aim of discrediting them. To counter the perception that the witnesses had embellished their stories, Agent Swanson testified that during the proffer process he would pose questions to which he already knew the answers to gauge whether potential cooperators were inclined to be truthful. Quinn's counsel objected to such testimony on the ground that it was impermissibly "bolstering the truthfulness of other witnesses." *Id.* The court ruled that "your cross-examination has put into issue the whole debriefing and cooperation process." *Id.* We agree with the district court. By casting doubt on how forthcoming the witnesses were during their proffers, the defendants opened the door to testimony about how the government conducted the proffer process.

In any event, Agent Swanson's testimony did not amount to improper bolstering. While the defendants contend this testimony amounted to the government's implicit guarantee that it could monitor the witnesses' truthfulness, we rejected a similar argument in *United States v. Jones*, 468 F.3d 704 (10th Cir.

2006). There, though the government agent testified that he used the proffer process to "gauge truthfulness," we found that such statements "did not amount to guarantees concerning the veracity of the witnesses." *Id.* at 708. Similarly, here, at no point did Swanson explicitly or implicitly guarantee that the witnesses' statements were true. *See Bowie*, 892 F.2d at 1498.

Brooks (though not Quinn) also contends that Agent Swanson impermissibly bolstered Brown as a government witness by testifying that Brown's testimony at trial was consistent with what Brown had told him during the proffer process. Brooks did not object to this testimony at trial, so we review for plain error. As an initial matter, we note that such comments are not a guarantee of a witness's veracity—only his consistency—and thus do not amount to impermissible vouching. *See Jones*, 468 F.3d at 708. Accordingly, the only grounds for challenging the admission of this evidence is if the comment was impermissible rehabilitation evidence.

Federal Rule of Evidence 801(d)(1)(B) allows prior consistent statements to be used to rebut a charge of recent fabrication as long as the motive to lie does not predate the prior statement. *Tome v. United States*, 513 U.S. 150, 167 (1995). This premotive rule applies even when a prior consistent statement is being used, as was the case here, to rehabilitate a witness rather than being offered for its truth. *United States v. Albers*, 93 F.3d 1469, 1484 n.2 (10th Cir. 1996).

Here, Brooks argues that Brown's proffer statement, following the rule in *Albers*, was inadmissible because Brown had a motive to lie at the time of the proffer. Yet Agent Swanson's testimony did not even come within the scope of Rule 801. Rule 801(d) carves out exceptions from the general exclusion of hearsay statements. We have previously held that the contents of the prior statements must be introduced in order for the statements to constitute hearsay. In *United States v. Martinez*, 76 F.3d 1145 (10th Cir. 1996), we held that asking a witness to "draw a comparison between his grand jury and trial testimony, and describe whether the former was truthful" did not elicit any hearsay statements. *Id.* at 1151. By contrast, in *Albers* the actual contents of the witness's prior statements were admitted, triggering the application of Rule 801. 93 F.3d at 1483–84. Most of Swanson's testimony falls under *Martinez* rather than *Albers*, as Swanson did not tell the jury the actual assertions Brown made, only that Brown's trial testimony was consistent with his proffer statements.

The one point at which the contents of Brown's statement were admitted—testimony that Mark Brooks sold from the Spot—does not rise to the level of plain error. This testimony was cumulative at best, and thus even assuming the error was plain, it did not affect Brooks's substantial rights: there was more than enough evidence presented at trial that Mark Brooks was part of the conspiracy to sell drugs from the Spot, including wiretapped phone conversations between Brooks and Antonio, Brooks's arrest at the Spot, and Adrian Melendez's

-24-

testimony that Antonio gave Brooks cocaine. For similar reasons, Agent Swanson's comment that over 15,000 phone calls supported Brown's testimony (when only 4,000 phone calls were actually deemed pertinent), even if improper, was also harmless. Brown's testimony was not necessary to convict Brooks.

In short, Agent Swanson's testimony concerning Brown either did not amount to hearsay—and thus need not have met the premotive requirement of Rule 801(d)(1)(B)—or did not affect the outcome of the trial.[3]

## C.    Sufficiency of Evidence for Conspiracy Conviction (Quinn Only)

Quinn next argues there was insufficient evidence to support his conviction for conspiracy. In particular, Quinn argues there was no evidence of an agreement between himself and the other conspirators nor evidence of interdependence. After reviewing the record, we disagree.

On a sufficiency of the evidence claim, "we view the facts in evidence in the light most favorable to the government." *United States v. Hasan*, 609 F.3d 1121, 1133 (10th Cir. 2010). Our review is limited. "We will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury." *Id.* We merely "determin[e] whether a reasonable jury could find guilt beyond a

---

[3] Given our conclusion that Agent Swanson did not improperly bolster the cooperating witnesses, we need not reach the argument that Brooks's sentence was erroneously calculated due to the drug amounts attributed to the conspiracy. The district court specifically found Brown to be a credible witness, and we see no basis for doubting this determination.

reasonable doubt, based on the direct and circumstantial evidence, together with the reasonable inferences to be drawn therefrom." *Id.*

To obtain a conviction for conspiracy, the government must prove: (1) an agreement by two or more people to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary participation in the conspiracy; and (4) interdependence among coconspirators. *United States v. Cornelius*, 696 F.3d 1307, 1317 (10th Cir. 2012).

For the interdependence prong, the test is whether coconspirators intended "to act together for their shared mutual benefit within the scope of the conspiracy charged." *Id.* In the world of drug dealing, "the fact that several individuals are in an economically symbiotic relationship may demonstrate that transactions among them are in pursuit of mutual benefit." *United States v. Caldwell*, 589 F.3d 1323, 1332 (10th Cir. 2009). "'Circumstantial evidence alone is often sufficient' to demonstrate interdependence, and a 'single act' can constitute sufficient proof." *Cornelius*, 696 F.3d at 1317 (quoting *Caldwell*, 589 F.3d at 1329).

Quinn primarily disputes the evidence of interdependence. Quinn's take on the evidence presented at trial is that it merely shows he sold drugs on his own, drugs which may have occasionally been supplied by his brother Antonio. Such resale arrangements alone, he contends, do not demonstrate that he entered into a conspiracy.

Quinn's characterization of the evidence is unconvincing. Quinn did not merely live across the street from his brothers and sell drugs as an "independent" dealer. He sold drugs *out of* both his brothers' respective houses (as well as his own house) and cooperated with them on various aspects of the drug business. One informant purchased drugs from Quinn at his brother's—Steven's—house, 2636. She also purchased drugs from Steven and Antonio at the same house. All of these purchases were done within two weeks of each other. These facts support the inference that the Quinn brothers were cooperating on drug sales.

Another informant also bought drugs from Quinn and another member of the conspiracy, and witnessed their use of similar drug dealing instruments inside the Spot. During one purchase, the informant followed Quinn to the Spot after first approaching him at Quinn's house. The informant also testified to purchasing crack at the Spot from codefendant Willie Ford. The informant testified that, during both purchases inside the Spot, Quinn and Ford used scales to measure the drugs. On another occasion, when the informant asked for Antonio, another member of the conspiracy, LaVaughn Brown, said, "[W]e all the same," which Garrison interpreted to mean that "whether I'm getting [the crack] from [Brown], Tony, or anybody else, it's the same. They all together." *Id.* at 1570. A reasonable jury could infer, given the other evidence presented, that this statement encompassed Quinn.

More damaging than the controlled purchases, however, was the testimony from Quinn's coconspirators, who explicitly implicated him in the drug conspiracy. Brown testified, for example, that Antonio ran the conspiracy, but its members, which included Quinn, "would go in on some deals and stuff" such as "pay the electric bills together." *Id.* at 934. Brown also testified that Quinn had open access to the Spot and could obtain crack from the Spot as needed for sales he did at his own house. The conspiracy's principal supplier, Daniel Garcia, testified that after delivering cocaine powder to Antonio he saw Antonio give Quinn a portion of it. Garcia also testified that he had seen Quinn, along with the other coconspirators, at the Spot, and that he saw all of them deal drugs there. This testimony, along with the controlled purchases, raise the strong inference of not only an agreement to distribute the drugs, but of interdependence; the conspiracy members clearly relied on each other for mutual benefit, as they shared supplies, costs, and customers.

Quinn tries to discredit the testimony of Garcia by pointing out that he never implicated Quinn in his initial proffer to the government. Yet he did implicate Quinn in his trial testimony, and insofar as the additional information that came out between the proffer and trial undermines Garcia's credibility this is beyond our review—we generally do not engage in credibility determinations. *See United States v. Cardinas Garcia*, 596 F.3d 788, 794 (10th Cir. 2010) ("[W]e will overturn a jury's credibility determination and disregard a witness's

testimony only if the testimony is inherently incredible . . . .").  While cross-examining Garcia at trial, Quinn's counsel made the same point about Garcia's proffer testimony.  To the extent the cross-examination failed to discredit Garcia's testimony in the jury's eyes, we will not disturb the jury's verdict.

Quinn also points to case law from the Seventh Circuit requiring proof of an agreement to conspire that goes beyond a normal buyer-seller relationship. *See United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010) ("When the alleged coconspirators are in a buyer-seller relationship . . . we have cautioned against conflating the underlying buy-sell agreement with the drug-distribution agreement that is alleged to form the basis of the charged conspiracy.").  Such proof, he contends, is absent.

The record belies his contention.  More than a casual buyer-supplier relationship existed between Quinn and the rest of the conspiracy members.  Their collaboration was substantial, covering the distribution of supplies and the payment of utilities.  Testimony about Quinn's constant presence and drug dealing at the Spot, along with his personal connections to the conspirators, supported a finding that Quinn was an active participant in the conspiracy.  While there appears to have been little evidence of profit sharing, the rest of the evidence supported the government's theory that Quinn was part of the conspiracy.

Nor does the absence of direct evidence of an agreement—such as documentation of profit divisions or recorded phone calls discussing Quinn's entry into an agreement—undermine the conviction. Just as circumstantial evidence is sufficient to prove interdependence, it is also sufficient to prove the existence of an agreement. *See Caldwell*, 589 F.3d at 1332 (circumstantial evidence can provide element of interdependence); *United States v. Wardell*, 591 F.3d 1279, 1287 (10th Cir. 2009) ("[C]onspiracy convictions may be based on circumstantial evidence."); *United States v. Redwine*, 715 F.2d 315, 320 (7th Cir. 1983) ("The government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof.").

In sum, there was more than enough evidence for a reasonable jury to convict Quinn of conspiracy.

### D.    *Evidence of Prior Drug Conviction– Rule 404(b) (Quinn Only)*

Quinn also argues the district court erred in allowing evidence of his prior drug distribution conviction to be admitted at trial. We review the admission of prior conduct evidence for abuse of discretion. *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006).

The government sought admission of Quinn's prior drug conviction via a motion *in limine*. It did so on the grounds that Quinn's prior conviction for crack

distribution linked him to other members of the conspiracy. The district court provisionally allowed the evidence, reserving its final ruling for trial. At trial, the court ruled the evidence was admissible.

The evidence of Quinn's prior conviction was received at two separate points during trial. The first instance was during Agent Swanson's testimony, where he testified about the drugs discovered at 2648, "the Brick House," located one block away from the other houses in the conspiracy. On cross-examination, Quinn's counsel asked questions intended to negate any connection between the Brick House and Quinn. The court then allowed the government, on redirect, to ask Swanson about the residential address Quinn had placed on his probation form following his prior conviction—which was the 2648 address.

The second instance was during Brown's testimony, where he testified that he had been selling crack in that neighborhood with many of the coconspirators, including Quinn, since they were teenagers. Brown also testified that he was arrested in 2000, along with Quinn, for dealing drugs. Prior to the 2000 arrest, Brown stated, Antonio supplied all of the coconspirators with crack, though none of them were charged with conspiracy in connection with that arrest. After the evidence was heard, the court adopted a limiting instruction.

Federal Rule of Evidence 404(b) prohibits a prior conviction from being used "to prove the character of a person in order to show action in conformity

therewith." Fed. R. Evid. 404 (West 2011).[4] A prior conviction, however, may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." *Id.* "The list of proper purposes is illustrative, not exhaustive, and Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001) (emphasis in original; internal quotation marks omitted).

In determining whether a prior conviction was properly admitted, we conduct a four-part inquiry, ensuring that (1) the evidence was offered for a proper purpose under Rule 404(b); (2) the evidence was relevant under Rule 401; (3) the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice under Rule 403; and (4) the district court, upon request, instructed the jury to consider the evidence only for the purpose for which it was admitted. *United States v. Davis*, 636 F.3d 1281, 1297 (10th Cir. 2011). We now turn to that inquiry.

### 1. *Proper Purpose*

Evidence of Quinn's prior conviction was admitted for a proper purpose under Rule 404(b). While Quinn contends that because the prior conviction was

---

[4] The language of Rule 404 was slightly modified in 2011, with effective date December 1, 2011. Because the trial occurred in August 2011, the version prior to modification was in effect.

only for drug distribution and not for conspiracy it could not be admitted to prove he entered into the charged conspiracy, he is mistaken.

Evidence of prior bad acts can be used for any relevant purpose other than demonstrating criminal propensity. *See Tan*, 254 F.3d at 1208. We have "recognized the probative value of uncharged acts evidence to demonstrate motive, intent, knowledge, or plan in the context of a conspiracy prosecution." *United States v. Record*, 873 F.2d 1363, 1375 (10th Cir. 1989); *see also United States v. Lin Guang*, 511 F.3d 110, 121 (2d Cir. 2007) (past uncharged conduct between defendant and coconspirator admissible to "show the existence of the illegal relationship . . . and how it developed"); *United States v. Brown*, 200 F.3d 700, 708 (10th Cir. 1999) (gang affiliation admissible to show agreement to conspire and basis of relationship among coconspirators); *United States v. Ramirez*, 63 F.3d 937, 943 (10th Cir. 1995) (past drug involvement was admissible to show that "participation in the conspiracy was knowing"). Quinn's past associations and conduct with the conspiracy members were admissible to show his intent to join the conspiracy and the basis of the relationships between them. At no point was the jury asked to make the inference that Quinn had acted in conformity with a character trait.

Accordingly, admission of Quinn's past conviction was for a proper purpose and did not violate Rule 404(b).

## 2. *Relevance*

Quinn's prior conviction also satisfied Rule 401, which requires all admitted evidence to be relevant. To determine the relevance of a prior bad act, we look to the similarity of the prior act with the charged offense, including their temporal proximity to each other. *See Cardinas Garcia*, 596 F.3d at 798–99; *Mares*, 441 F.3d at 1158. "In evaluating the relevance of prior narcotics involvement in a subsequent narcotics case, we have noted that prior narcotics involvement is relevant when that conduct is close in time, highly probative, and similar to the activity with which the defendant is charged." *United States v. Wilson*, 107 F.3d 774, 785 (10th Cir. 1997) (internal quotation marks omitted).

Here, Quinn was not disputing his intent to distribute drugs, only his involvement in the conspiracy. The conspiracy charge required the government to prove that Quinn entered into an agreement to violate the law, knew the objectives of the conspiracy, and knowingly and voluntarily participated in it. *Cornelius*, 696 F.3d at 1317. The fact that Quinn previously dealt drugs with the coconspirators helps establish the basis of the relationship between them and his intent to do the same. He teamed up with them to deal drugs in 2000, and those relationships made it more likely he intended to team up with them again from 2006 to 2010, rather than just carrying on as an independent seller.

Even though the prior conduct and the beginning of the charged conspiracy were six years apart (2000 and 2006), the prior conduct was still relevant given

-34-

that most of the coconspirators, including Quinn, were in prison during the bulk of the intervening time. *Compare United States v. Cherry*, 433 F.3d 698, 702 & n.4 (10th Cir. 2005) (when defendant spent intervening time between offenses in prison, five-year-old drug distribution conviction still relevant to subsequent drug distribution charge), *with United States v. Becker*, 230 F.3d 1224, 1232 (10th Cir. 2000) (requirement that prior drug involvement be close in time not met with a six-year-old conviction). And, contrary to Quinn's argument, it does not matter that the prior conviction was for drug distribution and not conspiracy. Brown's testimony suggested that many of the codefendants conspired to distribute drugs in 2000, even though prosecutors did not charge their conduct as such. The charged act of drug distribution coupled with Brown's testimony that they cooperated previously in dealing drugs made Quinn's prior conviction relevant; overall, the testimony went to both the objective of the conspiracy and Quinn's intent.

Accordingly, Brown's testimony about Quinn's prior conduct was relevant.

### 3.    *Prejudice*

Evidence of Quinn's past involvement with the coconspirators also passes muster under Rule 403. The Rule mandates excluding evidence only if the danger of unfair prejudice substantially outweighs the evidence's probative value. The "exclusion of evidence under Rule 403 . . . is an extraordinary remedy and should be used sparingly." *Tan*, 254 F.3d at 1211. The core of unfair prejudice is

-35-

evidence that invites "decision on an improper basis." *United States v. Irving*, 665 F.3d 1184, 1213 (10th Cir. 2011). An improper basis is more likely to surface when the government introduces evidence that impugns the defendant's character or "provokes an emotional response in the jury." *Id.*; *see also Wilson*, 107 F.3d at 785 (conviction for drug *possession* unfairly prejudicial for proving drug *distribution* charge because it "tends to incriminate [the defendant's'] character and portray him as a drug user, who thus is likely to be the individual who sold cocaine" at a particular house).

That is not the case here. At trial Quinn disputed only his involvement in the conspiracy, but not that he dealt drugs. Thus, in the jury's eyes, he was already a drug dealer. The fact that he also dealt drugs in the past casts him in only a marginally worse light than the one that otherwise would have shone upon him. And the additional information—that he dealt drugs *with* the same coconspirators—does not reflect any worse on his character nor invites the jury to make a decision based on emotion. It only helps prove that he intentionally joined the conspiracy. Such circumstantial evidence that helps establish intent may be prejudicial, in the sense that it helps prove the offense, but it is not *unfairly* prejudicial. *See Mares*, 441 F.3d at 1159 (prior conduct evidence was not unfairly prejudicial even though it "rebutted [defendant's] theory of defense").

### 4. Limiting Instruction

The limiting instruction was a correct statement of the law.[5] And, absent a showing to the contrary, we "presume jurors will conscientiously follow the trial court's instructions." *Cardinas Garcia*, 596 F.3d at 798 (internal quotation marks omitted).

\* \* \*

Because the district court gave a limiting instruction and the prior conviction meets the requirements of the Rules 401, 403, and 404(b), the district court did not abuse its discretion in admitting such evidence.

### E. Sentencing Challenges (Brooks and Quinn)

Finally, we consider Quinn's challenge to his sentence on the ground of procedural unreasonableness as well as Brooks's challenge to his sentence on the ground of substantive unreasonableness. Neither defendant's objection has merit.

We review a trial court's imposition of a sentence under an abuse of discretion standard to determine whether it was reasonable. *United States v.*

---

[5] The complete limiting instruction was as follows:

> You have heard evidence that in the past, defendants committed other crimes. You may consider that evidence only as it bears on any defendant's plan, intent, motive, preparation and knowledge, and whether defendant entered into a conspiracy, and for no other purposes. Obviously, the fact that a defendant previously committed an act similar to the one charged in this case does not mean that the defendant committed the acts charged in this case.

Quinn R., Vol. 3 at 2976.

*Sayad*, 589 F.3d 1110, 1116 (10th Cir. 2009). The reasonableness inquiry has both a procedural component and a substantive component. *Id.* Procedural reasonableness "involves using the proper method to calculate the sentence," and encompasses "selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* (citations omitted).

Substantive reasonableness, on the other hand, concerns the sentence's length. *Id.* In evaluating substantive reasonableness, "we afford substantial deference to the district court, and determine whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Balbin-Mesa*, 643 F.3d 783, 788 (10th Cir. 2011).

### 1.    Quinn's Challenge

Quinn raises several objections to his thirty-year sentence. He first notes that the probation office calculated his sentence based on the 2009 Guidelines rather than the 2011 Guidelines, which were in effect at the time he was sentenced. *See* USSG § 1B1.11 ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced."). Yet this difference did not have any effect on his ultimate sentence. The court determined he had an offense level of forty-two, which translated into a sentence range of thirty years to life. While Quinn argues he was supposed to have an offense level of forty, he admits

that with his criminal background he would have been eligible for the exact same range, thirty years to life.

Quinn then attacks the two-level enhancement he received for drug trafficking in a protected location. *See* USSG § 2D1.2. Quinn contends that he should have received only a one-level enhancement. Section 2D1.2 instructs the sentencing court to impose the sentence correlated to the highest offense level, the relevant options being: (1) two levels plus the offense level from § 2D1.1 "applicable to the quantity of controlled substances directly involving a protected location"; and (2) one level plus the offense level from § 2D1.1 "applicable to the total quantity of controlled substances involve in the offense." The PSR, which the district court followed, calculated Quinn's sentence according to the first option.

To accept Quinn's argument, we would have to find the trial court erred in attributing the entire drug amount, *i.e.*, more than 4.5 kg of crack, to a protected area (near the school) when it should have attributed only part of that amount. Yet Quinn has not shown that the district court erred. There are no citations to the record demonstrating the quantity of drugs dealt in homes located within the protected area compared to the quantity of drugs dealt in homes located outside the protected area. This is inadequate briefing and thus we can consider this argument waived. *See* Fed. R. App. P. 28(a)(9)(A) ("[T]he argument . . . must contain . . . appellant's contentions and the reasons for them, with citations to the

authorities and parts of the record on which the appellant relies."); *United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011) (arguments inadequately briefed are waived).

The next objection that Quinn raises to his sentence is the use of his prior conviction to enhance the applicable offense level.  Quinn contends that because his prior drug dealing conviction was used to determine his guilt for conspiracy, it cannot be used to calculate the applicable sentence—thereby entitling him to a two-level reduction in his offense level.  This argument is not meritorious.  The Sentencing Guidelines exclude from the definition of "prior sentence" "conduct that is part of the instance offense."  USSG § 4A1.2(a)(1).  Evidence of Quinn's prior sentence was admitted under Rule 404(b).  Yet Rule 404(b) only governs evidence of conduct *not* part of the present offense.  Were Quinn's prior drug dealing and conviction part of the present offense, then the government would not have needed Rule 404(b) in the first place.  *See United States v. Parker*, 553 F.3d 1309, 1314–15 (10th Cir. 2009) ("[E]vidence of acts or events that are part of the crime itself . . . does not fall under the other crimes limitations of Rule 404(b).").  As already noted, Quinn's prior conviction was used substantively only as circumstantial evidence; it was not an element of his current offense.  And Quinn points to no authority supporting his novel argument that evidence used substantively cannot be used to enhance his sentence.  Accordingly, the district court did not err in increasing the offense level.

Finally, Quinn contends the district court erred in determining the quantity of drugs dealt through the conspiracy. In reality, 4.5 kg of cocaine base was at the low end of what the court could have attributed to Quinn. Brown testified that during his most intense involvement with the conspiracy, he distributed at least 1 kg per month for twenty-one months; based on a thirty-seven-month conspiracy, the PSR came to a calculation of 37 kg. There were also estimates from the conspiracy's suppliers—Melendez and Garcia—that ran from 50 kg to 222 kg. Rather than demonstrating the sentencing court committed clear error in its findings, Quinn makes claims that merely reargue his alleged lack of involvement in the conspiracy. As already discussed earlier, these arguments fail.

Our review of the record convinces us that Quinn's sentence was procedurally reasonable.

### 2.    *Brooks's Challenge*

Brooks argues that the ten-year disparity between his sentence (thirty-five years) and that of Antonio, who pleaded guilty and received twenty-five years, makes his sentence substantively unreasonable. While acknowledging that Antonio's lower sentence was partly in exchange for his guilty plea, Brooks contends the guilty plea alone cannot justify the difference in their sentences in light of Antonio's more extensive involvement in the conspiracy.

When the district court imposes a within-guidelines sentence there is a presumption of substantive reasonableness. *Balbin-Mesa*, 643 F.3d at 788.

-41-

While, under 18 U.S.C. § 3553(a)(6), the district court should "avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct," the statute "requires a judge to take into account only disparities *nationwide* among defendants with similar records and Guideline calculations. It is not reversible error for a sentencing court to adhere to this interpretation in its exercise of sentencing discretion." *United States v. Damato*, 672 F.3d 832, 848 (10th Cir. 2012) (emphasis in original; citation omitted).

Because Brooks was given a within-guidelines sentence (thirty-five years, when the range was thirty years to life), we accord his sentence a presumption of substantive reasonableness. And we have previously rejected claims of substantive unreasonableness based on sentencing disparities among codefendants where one of them had a Rule 11(c)(1)(C) agreement, which stipulates to the length of imprisonment rather than leaving it to the discretion of the court to impose a sentence. *See United States v. Martinez*, 610 F.3d 1216, 1228–29 (10th Cir. 2010). Here, Antonio also had a Rule 11(c)(1)(C) agreement, whereas Brooks went to trial. The plea agreement's lower stipulated sentence reflected Antonio's acceptance of guilt and the sparing of substantial judicial resources that otherwise would have been devoted to his trial. There was a reasonable basis for Brooks to receive ten more years' imprisonment than Antonio.

Accordingly, Brooks cannot show the district court abused its discretion in sentencing him to thirty-five years' imprisonment.

## III.  Conclusion

Neither Brooks nor Quinn has a meritorious claim for relief.  Accordingly, we AFFIRM their convictions and sentences.