**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 26, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

HAROLD ARTHUR HENTHORN,

Defendant - Appellant.

No. 15-1490

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:14-CR-00448-RBJ-1)**

O. Dean Sanderford, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Districts of Colorado and Wyoming, Denver, Colorado, for Appellant.

J. Bishop Grewell, Assistant United States Attorney (Robert C. Troyer, Acting United States Attorney, with him on the brief), Office of the United States Attorney, Denver, Colorado, for Appellee.

Before **TYMKOVICH**, Chief Judge, **SEYMOUR**, and **KELLY**, Circuit Judges.

**TYMKOVICH**, Chief Judge.

This case presents us with the difficult issue of whether a district court presiding over a murder trial abused its discretion in admitting evidence of prior,

similar incidents, including whether the defendant killed his second wife in circumstances similar to those that led to the death of his first wife.

We affirm. The district court did not abuse its discretion in admitting prior similar conduct. The court fully explained, and we agree, that the evidence was properly admitted under Federal Rule of Evidence 404(b), was relevant, and was not substantially outweighed by unfair prejudice.

## I. Background

In September 2012, Harold Henthorn's second wife, Toni,[1] died after falling more than 100 feet from a cliff in Rocky Mountain National Park. She fell in a remote location with poor cellular service and no nearby aid stations. Henthorn first called 911 around 6:00 pm, but—due to the remoteness of the location—by the time the first ranger arrived on the scene, it was after 8:00 pm and Toni was dead. After an investigation, Henthorn was charged with and tried for first-degree murder on the government's theory that he, with premeditation and malice aforethought, pushed Toni over the cliff to her death.

The evidence presented at trial provides a basic timeline of events, starting in the early afternoon when Henthorn and Toni set out for their hike as part of a celebration of their twelfth wedding anniversary. Sometime before 3:30 pm, the

---

[1] Because this opinion refers to two of Henthorn's wives, both of whom took his surname upon marriage, we refer to them by their first names to avoid any ambiguity.

couple left the established trail. Photographs around this time show the couple eating lunch atop a scenic cliff overlook. Additional photographs indicate that the couple continued off trail and found a cliff below their lunch spot around 4:45 pm. It is estimated that Toni fell from that cliff shortly before 5:15 pm. Henthorn estimates it took him forty-five minutes to call 911 after Toni's fall, including fifteen minutes to reach her body and thirty minutes to assess and move her, return to cellular coverage, and call 911. The first 911 call occurred at 5:54 pm. At 6:16 pm, Henthorn sent a text message to Toni's brother, Barry Bertolet, indicating that Toni was in critical condition after falling from a rock, EMTs were coming, Barry should catch the next flight, and his cell phone battery was low. Henthorn exchanged several conversations with 911 dispatchers between the time of his first call at 5:54 pm and when the first EMT ranger arrived at the scene around 8:00 pm, examined Toni's body, and reported her death.

An investigation of the incident raised a number of questions about Henthorn's version of events. For example, Henthorn told a ranger that he and Toni initially planned to hike the Bear Lake trail, a half-mile of paved, handicapped-accessible walking with no elevation gain. He explained that they switched to Deer Mountain trail at the last second to avoid crowds. Deer Mountain trail is a three-mile hike climbing 1,200 feet from its trailhead to its 10,200-foot summit, and thus an odd choice for Toni, who had undergone three

knee surgeries and whose chronic injuries left her unable to ski. Henthorn also feigned unfamiliarity with the park and told a ranger that he had made only one earlier scouting trip to the park, but phone records revealed he visited the park at least eight or nine times in the six weeks before Toni's death. And while Henthorn described their venture away from the Deer Mountain trail to the off-trail lunch spot and lower cliff (where Toni fell) as a spontaneous decision to get away from crowds, find a romantic spot, or see wild turkeys or deer, investigators later discovered that he was quite familiar with the precise area where Toni died. For instance, Henthorn reported a white sheet adorned a cliff near Toni's fall, but that sheet had actually been removed by Park Service the week before her fall. And the Park Service found a detailed, annotated map of the park in Henthorn's car with notes, highlighting, and a pink "X" marking the spot on the map where Toni fell.

Evidence of Henthorn's communications during and after the incident was also troubling. For example, Henthorn reported certain vital signs (e.g., pulse and respirations), but the vitals he provided were inconsistent with Toni's injuries.[2]

---

[2] For example, during the 911 call beginning at 5:54 pm, Henthorn told the dispatchers that Toni had a head injury, a pulse of 60–80, and respirations of 5–8 per minute. He later (sometime between 6:16 pm and 6:39 pm) told Barry, Toni's brother, that Toni's pulse was 60 and respirations 5. And at 6:32 pm Henthorn told 911 dispatchers that Toni's breathing was shallow and he was about to start CPR. But, given her injuries, Dr. James Wilkerson (the Larimer County coroner and chief medical examiner, qualified by the court as an expert forensic pathologist) estimated at trial that Toni died between 20–60 minutes after her fall,

(continued...)

During the 911 call beginning at 6:54 pm, the dispatchers attempted to coach

Henthorn through CPR but doubted he was actually performing it.[3] Less than four

---

[2](...continued)
*see* R., Vol. VII, at 530, and was therefore almost certainly dead by 6:15 pm.

[3] Julie Sullivan (the emergency services dispatcher for the Larimer
Emergency Telephone Authority at the Estes Park Police Department) used a
"standardized protocol" to coach people through CPR over the phone and had
made "about 240" such calls before she talked with Henthorn in September 2012.
R., Vol. VII, at 165–66, 171–73. Sullivan testified that her conversation with
Henthorn was very unusual and she identified several red flags throughout the
process. In particular, she commented,

> In my experience, when I'm doing CPR with somebody, guiding them
> through it, even if they are experienced people, nurses and other people
> on the scene, they're extremely out of breath. I found it unusual that he
> wasn't letting me know when he was completed with an instruction I
> had given him. A lot of—you know, every other call I've been with,
> the person wants to know immediately what to do next. Okay, I did my
> 30, what do I do next. What do I do next. That was very unusual, and
> I didn't feel like he was doing the CPR. Most people because of the
> exertion of doing the CPR, the compressions and also giving the
> breaths, it's very exhausting. . . . I need to know when you're complete
> with it, so we can go ahead and go on to the next instruction, and he
> was not letting me know after he completed every instruction I'd given
> him. So I was prompting him to let me know. . . . And also we did
> have an open line. On all the other CPR calls that I've done through
> my career, I can hear them as they are doing the compressions on the
> patient 'cause it's a lot of breathing, it's a heavy breathing, it's very
> exhausting, and it's hard to even get out and talk back—they have a
> hard time talking with me because they are so out of breath because of
> the exertion.

*Id.* at 174–75; *see also id.* at 180 (Sullivan testifying, based on her experience,
that she "did not believe that [Henthorn] was doing the CPR," did not think he
was doing the steps with her, and was not out of breath—"That's why I asked if
someone else was there on the scene with him. I was wondering if somebody else
was doing the chest compressions and the CPR").

minutes into the call, Henthorn said he had to turn off his phone because his battery was almost gone. After hanging up on the 911 dispatcher, however, Henthorn made another twenty-two calls and sent or received ninety-eight text messages, including multiple calls and at least sixteen text messages to a friend asking if he could drive to pick Henthorn up from Estes Park and recommending that the friend take a particular route. And while Toni sustained serious injuries from the fall, the medical examiner found no signs of the abrasions, contusions, or anterior rib fractures typically associated with the performance of CPR.[4] Toni's lipstick was not even smeared from the alleged mouth-to-mouth resuscitation.

Finally, the investigation revealed Henthorn had taken out several large life insurance policies on Toni's life prior to her death and recently made himself the beneficiary of a life insurance annuity originally naming their seven-year-old daughter as the beneficiary.[5]

---

[4] Toni's fall was broken by a tree at the cliff's base, which scalped hair and tissue from her skull. Her brain was hemorrhaging, her neck was fractured, she had blunt force trauma to the chest, abdomen, and pelvis, her ribs were broken and her chest deformed with her liver and lungs lacerated and bleeding, and her skin was pale from blood loss.

[5] At the time of the incident, Henthorn held three $1.5 million life insurance policies on Toni and a $205,000 annuity—he stood to receive more than $4.7 million from Toni's death. But when a ranger asked about Toni's life insurance, Henthorn only mentioned a $1 million policy for the couple's daughter and a potential $50,000 policy from a recent car purchase.

During the course of the investigation, prosecutors learned of two prior incidents involving Henthorn and his wives. *First*, they became aware of the mysterious circumstances surrounding the death of Henthorn's first wife, Lynn, in May 1995. Lynn died while she and Henthorn were changing a tire on the side of the road; she was crushed under the car and died from internal injuries consistent with traumatic asphyxiation. Prior to that incident, Henthorn had also taken out a large life insurance policy on Lynn, but no legal action came as a result. *Second*, they discovered an incident in May 2011 when Henthorn threw a heavy beam off a deck he was repairing at the couple's vacation cabin near Grand Lake, Colorado. The beam struck Toni in the back of the neck and upper back, injuring her neck.

The district court allowed the prosecution to present evidence at Henthorn's murder trial of the two prior incidents to rebut Henthorn's defense that Toni's death was an accident. On appeal, Henthorn contends the district court erred in admitting the evidence.

## II. Analysis

Evidence of crimes, wrongs, or other acts is prohibited under the Federal Rules of Evidence when used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence is permitted, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge,

-7-

identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). To determine whether Rule 404(b) evidence is properly admitted, we look to the four-part test from *Huddleston v. United States*, 485 U.S. 681 (1988):

(1) The evidence must be offered for a *proper purpose* under Rule 404(b);

(2) The evidence must be *relevant* under Rule 401;

(3) The *probative value* of the evidence must not be substantially outweighed by its potential for unfair prejudice under Rule 403; and

(4) The district court, upon request, must have *instructed the jury* pursuant to Rule 105 to consider the evidence only for the purpose for which it was admitted. *See United States v. Rodella*, 804 F.3d 1317, 1333 (10th Cir. 2015), *cert. denied*, 137 S. Ct. 37 (2016).

Admissibility of evidence under Rule 404(b) "involves a case-specific inquiry that is within the district court's broad discretion." *United States v. Mares*, 441 F.3d 1152, 1157 (10th Cir. 2006) (citing *United States v. Olivo*, 80 F.3d 1466, 1469 (10th Cir. 1996)). We review a district court's decision to admit such evidence for an abuse of discretion and "will not reverse unless the district court's decision exceeded the bounds of permissible choice in the circumstances or was arbitrary, capricious or whimsical." *Rodella*, 804 F.3d at 1329 (citing *United States v. Nance*, 767 F.3d 1037, 1042 (10th Cir. 2014)).

Before trial, the government filed a notice of Rule 404(b) evidence, stating that it planned to introduce evidence of three prior incidents involving Henthorn,

-8-

his wives, and his former sister-in-law: (1) Lynn's death while changing a tire in May 1995; (2) Henthorn's secret acquisition in 2010 of a $400,000 life insurance policy on Grace Rishell (who was married to Lynn's brother) in which he named himself as the primary beneficiary; and (3) a previous injury suffered by Toni in May 2011. The defense objected and filed a motion in limine to exclude the evidence, primarily on the ground that it constituted improper character evidence and was substantially more prejudicial than probative.

To consider the issues, the district court held an extensive, two-day hearing in which it heard evidence from ten witnesses (including seven defense witnesses), received over thirty exhibits, and heard oral argument from both sides. In a subsequent eighteen-page order covering all of the *Huddleston* factors, the district court ruled that the evidence of both prior incidents involving his wives would be admitted for the limited purpose of proving planning, intent, and lack of accident relating to Toni's death in September 2012. The court denied the government's request to allow testimony regarding the life insurance policy Henthorn took out on his former sister-in-law, finding that the incident "might be relevant to a charge of attempting to defraud Ms. Rishell's insurance company, but . . . [was] not relevant to the actual crime charged" (i.e., Toni's murder). R., Vol. I, pt. 1, at 237–38. The court provided limiting instructions that emphasized the admitted evidence's limited purpose both when the evidence was introduced at trial and in the written jury instructions.

We address the district court's application of each of the four *Huddleston* factors in turn.

### 1. Factor One: Proper Purpose

The first *Huddleston* factor requires the evidence be offered for a proper purpose under Rule 404(b). "Evidence is offered for a proper purpose if it is utilized for any of the 'other purposes' enumerated in Rule 404(b)," *United States v. Davis*, 636 F.3d 1281, 1298 (10th Cir. 2011), and that enumerated list "is illustrative, not exhaustive," *United States v. Brooks*, 736 F.3d 921, 939 (10th Cir. 2013) (citing *United States v. Tan*, 254 F.3d 1204, 1208 (10th Cir. 2001)). "Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *Brooks*, 736 F.3d at 949.

The government was required to prove Henthorn committed a specific intent crime: first-degree murder requires a "willful, deliberate, malicious, and premeditated killing." 18 U.S.C. § 1111(a). It offered the prior acts evidence to prove "Henthorn's intent, motive, and plan," and to "establish that the death of his wife Toni was no accident." R., Vol. I, pt. 1, at 16; *id.* at 22 (invoking "intent, motive, planning, preparation, and lack of accident"). The district court admitted the evidence to "rebut[] the defense of accident or to show[] plan and intent." *Id.* at 231, 237. These purposes are specifically contemplated by Rule 404(b) and are plainly proper. *See* Fed. R. Evid. 404(b)(2) (listing "motive,

-10-

opportunity, *intent*, preparation, *plan*, knowledge, identity, absence of mistake, or *lack of accident*" (emphases added)).  Henthorn does not argue otherwise.[6]

The first *Huddleston* factor is satisfied.

### 2. Factor Two:  Relevance

The second *Huddleston* factor requires the evidence be relevant under Rule 401.  Evidence is relevant if: (1) "it has any tendency to make a fact more or less probable than it would be without the evidence"; and (2) "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  In other words, "[r]elevant evidence tends to make a necessary element of an offense more or less probable."  *Davis*, 636 F.3d at 1298.

### a. Similarity

The lynchpin of *Huddleston* relevance is similarity.  "To determine the relevance of a prior bad act, we look to the similarity of the prior act with the charged offense, including their temporal proximity to each other."  *Brooks*, 736 F.3d at 940.  Uncharged acts are admissible "as long as the uncharged acts are similar to the charged crime and sufficiently close in time."  *Mares*, 441 F.3d at 1157 (citing *United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000)).  "[T]he degree to which factors such as temporal distance and geographical

---

[6] To the extent, if any, that Henthorn disputes whether the district court admitted the evidence for a proper purpose under Rule 404(b)—namely, whether the evidence was improperly admitted to show Henthorn's alleged propensity to commit murder—his arguments hinge on contentions of relevance that we address under the second *Huddleston* factor.

proximity are important to a determination of the probative value of similar acts will necessarily depend on the unique facts of each case's proffered evidence." *Mares*, 441 F.3d at 1159. But even so, acts "quite remote to the crime[] charged have frequently been deemed by us and our sister circuits to be relevant if they were sufficiently similar to those crimes." *United States v. Watson*, 766 F.3d 1219, 1240 (10th Cir. 2014). In other words, there is "no absolute rule regarding the number of years that can separate offenses." *Id.* (citations omitted). Instead, this court "applies a reasonableness standard and examines the facts and circumstances of each case." *Id.* (citations omitted).

As the district court concluded, the prior incidents here were both extraordinarily similar to the charged offense.

### i. *Lynn's Death*

Henthorn's first wife, Lynn, died from internal injuries consistent with traumatic asphyxiation after being pinned under a vehicle. The incident occurred in May 1995 when she and Henthorn were changing a tire on a remote highway approximately thirty miles from their home in southwest Denver. The couple pulled over on a gravel slope alongside the road in a heavily forested area. It was dark and there was no cellular service. There were no houses nearby and the nearest hospital was a forty-minute drive away.

Several suspicious facts about the incident are noteworthy. For example, the tire the couple stopped to change was not flat, but merely low, and was

-12-

measured at 15 out of 44 pounds of pressure (i.e., approximately 34 percent). The spare tire they sought to replace it with was measured at only 4 pounds more (i.e., 19 out of 44 pounds of pressure, or approximately 43 percent). Other tires on the vehicle were also low, inflated between 27–30 out of 44 pounds of pressure (i.e., approximately 61–68 percent). A local mechanic coincidentally drove by the couple around 9:30 pm and asked the Henthorns if they needed any help. Even though Henthorn had only a small flashlight and would later claim he did not know how to change a tire, he declined the mechanic's offer to shine his headlights on the scene or otherwise help change the tire.

Half an hour later, around 10:00 pm, Henthorn flagged down another car and told the occupants the car had fallen on top of his wife. They drove back up the road to try to find a house and call 911 but, when they could not find a phone, returned to the scene to try to help. Two men were able to lift up the car and free an unconscious Lynn. Then, Henthorn angrily screamed at them not to touch her. Over Henthorn's objections, they started CPR and got her breathing again. Meanwhile, another passenger left the scene again, to try to find a phone, and returned with blankets after finding someone to call 911. Emergency vehicles eventually arrived at the scene and Lynn was airlifted to a nearby hospital but died in surgery due to internal injuries.

Henthorn later told inconsistent stories about the incident. For example, Henthorn told an emergency responder that Lynn was changing the tire, but told

-13-

others that he was the one changing the tire. He told officers he used boat jacks to prop up the car because he had tried the regular jack but could not get it to work even after he lubricated it. No lubricant or oil was found at the scene. Henthorn also suggested that he got Lynn out from under the car and started CPR (without any mention of the passersby who stopped to help and were the ones to perform CPR), and he vacillated between whether he and Lynn were going to, or coming from, dinner. When law enforcement asked Henthorn whether Lynn's life was insured, he disclosed only one of the multiple life insurance policies he would collect on. Henthorn ultimately collected $600,000 in life insurance, including proceeds from a policy that went into effect only two and a half months before Lynn's death and from an accidental death rider that doubled the benefit from $150,000 to $300,000 in the event Lynn died in an accident.

A couple days after the incident, one of the good samaritans who stopped to help called law enforcement to voice her suspicions and ask if Henthorn had been arrested in connection with Lynn's death. While law enforcement briefly investigated Lynn's death as a suspicious incident, investigators eventually determined her death was an accident despite the unusual circumstances. For example, even though a sheriff's deputy photographed a suspicious shoe print atop the car's fender (potentially suggesting that the car had been pushed off, rather than fallen from, the jacks) and investigators took a photograph of

Henthorn's shoes for comparison purposes, that comparison was never made. The investigators also never challenged Henthorn's inconsistent statements.

## ii. Toni's Injury

In May 2011, Henthorn's second wife, Toni, suffered a neck injury when she was struck in the back of the neck and upper back with a large wooden beam. The incident occurred when she and Henthorn were staying at their cabin near Grand Lake, Colorado. It was dark and their secluded cabin was surrounded by trees on three sides.

Several facts about the Grand Lake deck incident raise suspicion. For example, it was around 10:00 pm at night but Henthorn was allegedly doing construction work or cleaning on the deck of the cabin. Henthorn later told inconsistent stories about the incident. For example, Henthorn told the paramedics he threw the beam that hit Toni, but told an emergency room doctor that the beam had merely fallen off the deck and hit her. He also told a friend that he dropped the beam on Toni when he slipped from a ladder that she was holding. A nurse's note in Toni's file indicates that Toni was under the deck, holding a flashlight for Henthorn when the beam fell. And in one account, given to friends he called to come and watch his and Toni's daughter (who was asleep inside the cabin), Henthorn suggested Toni was cleaning up around the deck and had just bent down when a piece of lumber fell off the deck and hit her. If she had not bent down, the beam would have presumably hit her in the head instead of

-15-

the neck and back.  But when the friends arrived at the cabin that night to watch the Henthorns' daughter, they did not see any lumber on the deck.

Prior to the incident, Henthorn held four $1.5 million life insurance policies on Toni but cancelled one of the policies—the second of two with the same insurance company, American General—in February 2011, three months before the injury.  One month before the injury, in April 2011, Henthorn made himself the beneficiary of a $205,000 life insurance annuity bought by Toni's parents for the Henthorns' young daughter.

At the time, medical personnel deemed the incident an accident.  No one, including Toni, voiced any suspicions that Henthorn intended to injure her and there were no police reports or activity.

\* \* \*

Each incident, including Toni's death, occurred in a remote location which impeded communications, delayed emergency responders, and reduced the likelihood of accidental witnesses.  Indeed, Henthorn was always the only witness at the time of injury.  And in the aftermath of each incident, Henthorn told inconsistent stories about what happened.  Although there is a seventeen-year gap between his first wife's death and Toni's, the temporal distance is not per se disqualifying,[7] and does not overshadow the marked similarities between the

---

[7] *See, e.g.*, *United States v. Watson*, 766 F.3d 1219 (10th Cir. 2014) (ten to seventeen years); *United States v. Roberts*, 185 F.3d 1125 (10th Cir. 1999)
(continued...)

incidents.  Henthorn's first wife, Lynn, died after thirteen years of marriage to Henthorn.  His second wife, Toni, died after twelve years of marriage.  Henthorn lied about the applicable life insurance policies and collected significant sums of life insurance proceeds from each death.  Over their respective family's objections, he also had each woman's body quickly cremated and spread their ashes at the same spot on Red Mountain near Ouray, Colorado.

### b.  Independence from Character Inferences

Evidence's relevance cannot "depend on a defendant likely acting in conformity with an alleged character trait" or require the jury to draw a "chain of inferences dependent upon [a] conclusion" about the defendant's character.  *See United States v. Commanche*, 577 F.3d 1261, 1267, 1269 (10th Cir. 2009).  But all this is "not to say that other-act evidence must be excluded whenever a propensity inference can be drawn; rather, Rule 404(b) excludes the evidence if its relevance to 'another [proper] purpose' is established *only* through the forbidden propensity inference."  *Rodella*, 804 F.3d at 1333.

---

[7](...continued)
(sixteen years); *United States v. Meacham*, 115 F.3d 1488 (10th Cir. 1997) (twenty-five to twenty-nine years); *United States v. Wacker*, 72 F.3d 1453 (10th Cir. 1995) (thirteen years); *see also, e.g.*, *United States v. Luger*, 837 F.3d 870 (8th Cir. 2016) (twenty-five years); *United States v. Sterling*, 738 F.3d 228 (11th Cir. 2013) (fifteen years); *United States v. Rodriguez*, 215 F.3d 110 (1st Cir. 2000) (fifteen years); *United States v. Hernandez-Guevara*, 162 F.3d 863 (5th Cir. 1998) (eighteen years); *United States v. Hadley*, 918 F.2d 848 (9th Cir. 1990) (fifteen years).

Evidence remains admissible even if it has the potential "impermissible side effect of allowing the jury to infer criminal propensity," so long as the jury "[i]s not *required* to make any such inferences in order to also" find wilfulness or intent. *See id.* at 1333–34 (emphasis added). For example, consider our decision in *United States v. Moran*, 503 F.3d 1135 (10th Cir. 2007). There, the district court presiding over defendant Moran's trial for being a felon in possession of a firearm allowed the government to present evidence of Moran's prior felon-in-possession conviction. *See id.* at 1138–39. While the use of Moran's prior conviction to help prove the only challenged element of the charged offense (i.e., that Moran "knowingly possessed" the firearm) "involve[d] a kind of propensity inference (i.e., because he knowingly possessed a firearm in the past, he knowingly possessed the firearm in the present case)," we explained that the inference did "not require a jury to first draw the forbidden general inference of bad character or criminal disposition." *Id.* at 1145. Instead, the inference was "specific" and "rest[ed] on a logic of improbability that recognizes that a prior act involving the same knowledge decreases the likelihood that the defendant lacked the requisite knowledge in committing the charged offense." *Id.*

Likewise, the use of the prior incidents here rests on a logic of improbability that recognizes that prior incidents involving similar circumstances decrease the likelihood that Henthorn lacked the requisite intent, motive, and plan

-18-

in committing the charged offense. Indeed, the prior incidents make it more likely that the charged offense was the product of design, rather than an accident.[8]

In asserting that the evidence is irrelevant, Henthorn relies on our decision in *Commanche*, where we reversed the district court's decision to admit Rule

---

[8] Henthorn and the government spar over whether the chain of logic supporting admission of the prior incidents is one of relevance or character. This logic may be—but is not necessarily—viewed as an application of the so-called "doctrine of chances." The doctrine of chances relies on objective observations about the probability of events and their relative frequency, and the improbability of multiple coincidences. As explained by the Seventh Circuit in *United States v. York*, 933 F.2d 1343 (7th Cir. 1991), the doctrine "tells us that highly unusual events are highly unlikely to repeat themselves . . . . The man who wins the lottery once is envied; the one who wins it twice is investigated." *Id.* at 1350. Although this court has never explicitly endorsed the doctrine of chances, we have acknowledged the doctrine in upholding the relevance of prior act evidence to prove specific intent in a criminal drug trafficking case. *See United States v. Cherry*, 433 F.3d 698, 701–02 (10th Cir. 2005). For academic analysis and criticism of the doctrine, see generally Edward J. Inwinkelried, *An Evidentiary Paradox: Defending the Character Evidence Prohibition by Upholding a Non-Character Theory of Logical Relevance, the Doctrine of Chances*, 40 U. Rich. L. Rev. 419 (2006); Andrew J. Morris, *Federal Rule of Evidence 404(b): The Fictitious Ban on Character Reasoning from Other Crime Evidence*, 17 Rev. Litig. 181 (1998).

We are inclined to agree with the district court that the doctrine of chances "is merely one name to call a common sense observation that a string of improbable incidents is unlikely to be the result of chance," an observation recognized by the Supreme Court in *Lisenba v. California*, 314 U.S. 219, 227 (1941) (invoking the "widely recognized principle that similar but disconnected acts may be shown to establish intent, design, and system"). Indeed, *Lisenba* involved testimony concerning the mysterious death of the defendant's former wife, which was admitted as evidence in a trial against the defendant for the murder of his second wife "in a manner to give the appearance of accident" and collect life insurance. *Id.* at 223. The Court did not invoke the doctrine of chances by name, but rejected the defendant's argument that the death of his first wife was "wholly disconnected from the crime charged" and upheld the rule of evidence as applied. *See id.* at 226–27.

404(b) evidence. There, defendant Commanche faced criminal assault charges after injuring two unarmed opponents with a box cutter in a fight. *Commanche*, 577 F.3d at 1263. Commanche claimed he acted in self defense, and the government sought to introduce evidence of his two prior convictions for aggravated battery for altercations in which he brandished sharp cutting instruments. *See id.* at 1263–65. We concluded the evidence was irrelevant because "[t]he only disputed issue at trial was whether Commanche acted in self defense." *Id.* at 1265. The fact "[t]hat Commanche ha[d] twice been convicted of battering people in the past . . . ha[d] no direct bearing on whether he acted in self defense in this particular instance." *Id.* at 1268. As we explained, *Commanche* was not a case "in which intent is proven circumstantially based on repeated substantially similar acts" because the details of his prior convictions "demonstrate nothing about his intent; they simply show that he is violent." *Id.* at 1269. Notably, "[t]here [wa]s no indication in the record that Commanche claimed self defense on the other two occasions." *Id.*

Unlike the defendant in *Commanche*, Henthorn has repeatedly asserted the same defense—i.e., that he and his wives have been victims of multiple tragic accidents. The prior incidents admitted here have many more marks of similarity, especially those pointing to motive, intent, and planning. Our case is thus more akin to a hypothetical version of *Commanche* in which the defendant was involved in several fights and always claimed self-defense. At some point, the

-20-

court may reasonably begin to question whether the defendant actually acted in

self-defense and whether his use of force was justified.[9]

Although the evidence may allow the jury to draw negative inferences

about Henthorn's character, such inferences are not *required* before a jury may

---

[9] This is not a novel proposition. For example, in *State v. Roth*, 881 P.2d 268 (Wash. App. 1994), the court upheld the trial court's decision to admit evidence of the mysterious death of defendant Roth's second wife when Roth was on trial for his fourth wife's death. *See id.* at 271. Roth was not charged after his second wife fell from a cliff while the couple was hiking, and he collected significant life insurance proceeds. *Id.* Roth *was* charged, however, after his fourth wife drowned during an outing on an inflatable raft. *Id.* The court presiding over Roth's trial for murdering his fourth wife admitted evidence of the second wife's death to help prove Roth's intent, including "proof of scheme or plan, proof of motive, proof of distinctive modus operandi, to rebut a claim of accident, and under the doctrine of chances." *Id.* at 272. The trial court found the evidence of the second wife's death "highly relevant" and the appellate court further emphasized that the evidence was particularly probative because Roth's defense at trial was that his fourth wife's injuries occurred by happenstance or misfortune (i.e., that her death was an accident). *See id.* 273–75. As the court explained,

> [A] material issue of accident arises where the defense is denial and the defendant affirmatively asserts that the victim's injuries occurred by happenstance or misfortune. . . . It is undisputed that Roth's defense was that [his fourth wife's] drowning was accidental—*i.e.*, that no crime occurred. Clearly, then, evidence of a prior incident in which Roth married, insured, and murdered a woman would be highly relevant to a crucial aspect of the State's case: the need to rebut Roth's claim of accident and to establish an intentional killing. Thus, as the trial court concluded, the evidence was highly relevant as to a material assertion of the defendant.

*Id.* at 275. "[T]he marked similarities between the victims, the physical circumstances of the crimes, and the relatively complex nature of the crimes" further supported "a commonsense inference that the deaths of Roth's spouses were not mere fortuities." *Id.* at 276.

find that the prior incidents are relevant for a proper purpose—i.e., that they bear on Henthorn's intent, motive, plan, or lack of accident. The inference here, as in *Moran*, is specific and rests on a logic of improbability recognizing that a prior act involving similar circumstances decreases the likelihood that Henthorn lacked the specific intent in committing the charged offense.

### c.  Preliminary Rule 104(b) finding

"[I]n the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Dowling v. United States*, 493 U.S. 342, 346 (1990) (citing *Huddleston*, 458 U.S. at 689). This requirement stems from Federal Rule of Evidence 104(b), which, "[w]hen the relevance of evidence depends on whether a fact exists," requires proof "sufficient to support a finding that the fact does exist." Fed. R. Evid. 104(b); *see also Huddleston*, 458 U.S. at 689–91.

In its order admitting the challenged evidence, the district court readily acknowledged the prior incidents did "not present a typical prior-bad-act scenario." *See* R., Vol. I, pt. 1, at 224. "Usually, the prior act is clearly a bad act," but Henthorn insisted each incident was merely an accident. *Id.* (emphasis removed). And if the incidents *were* all accidents, the evidence would be irrelevant. As a prerequisite for admitting the evidence, then, the district court made two Rule 104(b) findings.

*First*, as to Lynn's death, the district court found there was sufficient evidence "for a jury to reasonably find the conditional fact—that Mr. Henthorn orchestrated the murder of Lynn Henthorn—by a preponderance of the evidence." *Id.* at 225. In reaching this conclusion, the district court credited evidence from the government "expos[ing] a number of discrepancies in Mr. Henthorn's various accounts of the events leading to the death of Lynn Henthorn," including: "[1] which of the couple was changing the tire; [2] whether one or two jacks were used to prop up the car initially; [3] whether the couple was returning from dinner or heading to dinner when the accident occurred; and [4] at what time the couple left their house that day." *Id.* Circumstantial evidence further supported the government's theory, including:

> [1] the fact that there was a shoe print on the wheel well of the tire being changed suggesting that the car may have been kicked or pushed off of the jack; [2] that the tire being replaced was not flat but only had low pressure, and that the spare tire had similarly low pressure; [3] that no lubricant was found in an inventory of the car to support Mr. Henthorn's allegation that he attempted to lubricate the proper jack so that he could use it; [4] that a passerby had stopped and offered to help change the tire, but that Mr. Henthorn declined his offer; [5] that the same passerby offered to shine his headlights on the car, which Mr. Henthorn also declined in spite of [its] being dark with no lights on the road and his only having a mini-flashlight; [6] that the incident occurred without any witnesses and in a remote location that delayed emergency responders; and [7] that in attempts to physically recreate the incident as told by Mr. Henthorn investigators have been unsuccessful.

*Id.* In addition, the government proffered evidence of Henthorn's inexplicable interactions with a second group of passersby after the car fell on Lynn, including

that "Henthorn attempted to prevent them from performing CPR on Lynn" and, because Henthorn "refused to warm Lynn with his coat in spite of the near-freezing temperatures," "the passersby instead placed their coats on her." *Id.* at 226. And the district court recognized testimony suggesting that in the aftermath of the incident the cremator found Henthorn's "insistence that Lynn be immediately cremated" to raise suspicion, and a deputy coroner investigator working on the case wanted to develop additional evidence but was not permitted to do so. *See id.* It was also discovered that, although Henthorn mentioned only one life insurance policy when he was questioned by officials, there were actually three policies in Lynn's name. *See id.* Combined, the district court thus found there was "sufficient evidence to support a reasonable finding by a jury that it is more likely than not that Lynn Henthorn's death was not an accident but instead a murder." *Id.*

*Second*, as to Toni's previous injury at the cabin near Grand Lake, the district court found "a jury could reasonably find by a preponderance of the evidence that the deck incident was not an accident, but rather a deliberate attempt to bring about his wife's death." *Id.* at 236. In reaching this conclusion, the district court determined the deck incident was "analytically similar" to the tire-changing incident. *See id.* at 235. As the district court explained,

> The circumstances of the accident were unusual. The Henthorns were ostensibly doing work outside their cabin late at night. Mr. Henthorn allegedly tossed or dropped a board over the edge of the deck, and it

-24-

struck his wife, who was picking up broken glass on the ground below, on the back of her neck. No one else was present. Toni sustained injuries serious enough to be taken to the local hospital and then transported to a trauma center in Denver, although the injuries turned out to be less serious than the initial diagnosis. Mr. Henthorn allegedly told inconsistent stories about what happened. He was the beneficiary of substantial insurance on Toni's life.

*Id.* The district court recognized this was a close call, and that while "[b]eing hit by a board dropped from ten feet may well cause serious injury, depending upon the size of the board and where the victim is hit," it would be "markedly less likely" to result in death than being pinned under a car or pushed off a cliff, and may be "an odd way to attempt it." *Id.*[10] Considering "all the evidence presented," however, the district court concluded that "a jury could reasonably find that the deck incident was a deliberate attempt on Mr. Henthorn's part to kill his wife, rather than an accident." *Id.*

Henthorn has not challenged either of these Rule 104(b) findings on appeal. And the jurors were repeatedly instructed to ignore the evidence of the prior incidents if they decided they were accidents.

\* \* \*

We are satisfied that the second *Huddleston* factor is met.

---

[10] We generally agree with the district court that admitting evidence of the Grand Lake deck incident was a "closer call" than admitting evidence of the tire-changing incident. R., Vol. I, pt. 1, at 235. Even if the district court's decision to admit evidence of the Grand Lake deck incident was error, however, we would find that any error was harmless in light of the tire-changing incident and other incriminating evidence presented at trial.

### 3. Factor Three:  Probative Value Versus Unfair Prejudice

The third *Huddleston* factor requires the evidence's probative value not be substantially outweighed by its potential for unfair prejudice.  The corresponding Federal Rule of Evidence provides that a court "may exclude evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  The exclusion of evidence under Rule 403 "is an extraordinary remedy and should be used sparingly."  *Brooks*, 736 F.3d at 940 (quoting *Tan*, 254 F.3d at 1211).

"Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart* from its judgment as to his guilt or innocence of the crime charged."  *United States v. MacKay*, 715 F.3d 807, 840 (10th Cir. 2013) (citation omitted) (emphasis added).  "In engaging in the requisite balancing," courts "give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value."  *United States v. Cerno*, 529 F.3d 926, 935 (10th Cir. 2008).  And "it is not enough that the risk of unfair prejudice be greater than the probative value of the evidence; the danger of that prejudice must *substantially* outweigh the evidence's probative value."  *Id.* "The trial court has broad discretion to determine whether prejudice inherent in

-26-

otherwise relevant evidence outweighs its probative value" and, for this court to overturn a district court's exercise of this discretion on appeal, we must be able to say the court made an "obvious" or "substantial" error. *See United States v. Magallanez*, 408 F.3d 672, 678–79 (10th Cir. 2005) (citation omitted).

Here, in admitting the challenged evidence the district court reasoned that "[a]lthough this evidence might provoke an emotional response, it would not do so 'wholly apart' from its relevance to rebutting the defense of accident or to showing plan or intent." R., Vol. I, pt. 1, at 231. The district court found that any prejudice resulting from the admission of the evidence was "therefore not 'unfair'" and, in any event, would not substantially outweigh the evidence's probative value. *See id.* at 231; *id.* at 237 ("As with the [tire-changing] incident, . . . the probative value of [the Grand Lake deck incident] is not substantially outweighed by the danger of unfair prejudice. If it were viewed by the jury as an accident, the deck incident would not reasonably provoke an emotional response adverse to Mr. Henthorn. If viewed by the jury as not having been an accident, then the deck incident presumably would adversely affect the jury's attitude toward Mr. Henthorn, but . . . not [ ] wholly apart from the jury's judgment as to his guilt or innocence of the crime charged.").

Assuming maximum reasonable probative force and minimum reasonable prejudicial value, *Cerno*, 529 F.3d at 935, we cannot say the district court abused its discretion in completing its Rule 403 balancing inquiry. While evidence of the

prior incidents was undoubtedly prejudicial in the broad sense, it was also highly probative of lack of accident and Henthorn's specific intent. Even if reasonable jurists may have weighed the Rule 403 factors differently and reached a different conclusion about the evidence's admissibility, we cannot say the district court made an "obvious" or "substantial" error.

Thus, the third *Huddleston* factor is satisfied.

### *4. Factor Four: Limiting Instruction*

The fourth and final *Huddleston* factor requires the district court, upon request, to instruct the jury to consider the evidence only for the purpose for which it was admitted. The corresponding Federal Rule of Evidence provides that "[i]f a court admits evidence that is admissible . . . for a purpose—but not . . . for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly." Fed. R. Evid. 105. For example, "[a] limiting instruction cautions the jury that the Rule 404(b) evidence should be considered only for the purposes for which it was admitted and not as evidence of the defendant's character or propensity to commit an offense." *Davis*, 636 F.3d at 1298.

Here, the district court gave limiting instructions both when the evidence of the tire-changing and Grand Lake deck incidents was first admitted at trial and again in the closing jury instructions. When the jury first heard the evidence at trial, the district court explained that the jurors could only consider the evidence

for the limited purposes of: (1) rebutting the defense that Toni's death was an accident; and (2) establishing planning and intent by Henthorn regarding Toni's death. *See* R., Vol. VII, at 937–38 (Grand Lake deck incident); *id.* at 1063 (tire-changing incident). The instructions also emphasized that Henthorn's commission of the acts involved in the prior incidents did not mean that he necessarily committed the act charged in the case, and that, if the jury decided Henthorn did not commit the acts involved in the prior incidents they were "not to consider the evidence about [the prior incidents] for any purpose." *See id.* at 938 (Grand Lake deck incident); *id.* at 1063–64 (tire-changing incident). When a juror asked the court to repeat the cautionary instruction, it did. *See id.* at 939.

After taking into account both parties' proposed 404(b) instructions, the court's written instructions at the close of trial again carefully cabined the jury's use of the prior acts evidence. The final instructions read as follows:

> During the trial you heard evidence about [the tire-changing and Grand Lake deck incidents]. When you heard that evidence I gave you an instruction about it. I am now repeating that instruction.

> You may consider the evidence about this incident only for the following limited purposes: (1) rebutting the defense that Toni Henthorn's death was an accident; and (2) establishing planning and intent by the defendant regarding Toni Henthorn's death.

> The fact the defendant may have previously committed [the tire-changing or Grand Lake deck acts] does not mean that he necessarily committed the act charged in this case.

-29-

If after your consideration of all the evidence, you decide [the tire-changing or Grand Lake deck incident] was an accident, then you are not to consider the evidence about that act for any purpose.

R., Vol. I, pt. 2, at 94–95. These instructions mirrored the defense's proposed 404(b) instructions with only minor modifications.[11]

We are satisfied these instructions adequately advised the jury of its obligations under Rule 404(b). And, "absent a showing to the contrary, we 'presume jurors will conscientiously follow the trial court's instructions.'" *Brooks*, 736 F.3d at 941 (citation omitted).

The district court's repeated explanations readily satisfy the fourth *Huddleston* factor.

## III. Conclusion

All four *Huddleston* factors are met—the government offered the evidence of the two prior incidents for a proper purpose under Rule 404(b), the evidence was relevant under Rule 401, the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice under Rule 403, and the district court repeatedly instructed the jury pursuant to Rule 105 to consider the evidence only for the purpose for which it was admitted. Accordingly, we

---

[11] In particular, the court's final instructions substituted "the defendant" for "Mr. Henthorn" twice and, in the final paragraph, used the phrase "If after your consideration of all the evidence, you decide the [tire-changing / Grand Lake deck] act was an accident" rather than "If you decide that Mr. Henthorn did not commit the [tire-changing / Grand Lake deck] act." *Compare* R., Vol. I, pt. 1, at 267–70, *with* R., Vol. I, pt. 2, at 94–95.

hold the district court did not abuse its discretion in admitting the challenged evidence and thus AFFIRM Henthorn's conviction.